[Cite as *State v. Adams*, 2025-Ohio-1419.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. Craig R. Baldwin, P.J. |
| Plaintiff-Appellee | Hon. William B. Hoffman, J.<br>Hon. Andrew J. King, J. |
| -vs- | |
| TERRENCE ANTHONY ADAMS | Case No. 2024CA00056 |
| Defendant-Appellant | O P I N I O N |

CHARACTER OF PROCEEDINGS:   Appeal from the Stark County Court of
Common Pleas, Case No. 2023CR2319

JUDGMENT:   Affirmed

DATE OF JUDGMENT ENTRY:   April 21, 2025

APPEARANCES:

For Plaintiff-Appellee       For Defendant-Appellant

KYLE STONE         D. COLEMAN BOND
Prosecuting Attorney      116 Cleveland Avenue, N.W., Suite 600
Stark County, Ohio       Canton, Ohio 44702

VICKI DESANTIS
Assistant Prosecuting Attorney
Appellate Section
110 Central Plaza South, Suite 510
Canton, Ohio 44702

*Hoffman, J.*

**{¶1}** Defendant-appellant Terrence Anthony Adams appeals his conviction and sentence entered by the Stark County Court of Common Pleas, on one count of disruption of public services, following a jury trial. Plaintiff-appellee is the State of Ohio.[1]

STATEMENT OF THE CASE AND FACTS

**{¶2}** On November 17, 2023, the Stark County Grand Jury indicted Appellant on one count of felonious assault, in violation of R.C. 2903.11(A)(1) and (D)(1)(a), a felony of the second degree (Count I); one count of disrupting public services, in violation of R.C. 2909.04(A)(1) and (C), a felony of the fourth degree (Count II); and one count of strangulation, in violation of R.C. 2903.18(B)(3) and (C)(3), a felony of the fifth degree (Count III). Appellant appeared before the trial court for arraignment on December 15, 2023, and entered a plea of not guilty to all of the charges.

**{¶3}** The matter proceeded to jury trial on March 11, 2024. As noted in Footnote 1, supra, the State failed to file a brief in this matter. When an appellee fails to file an appellate brief, App. R. 18(C) authorizes this Court to accept an appellant's statement of facts and issues as correct, and then reverse a trial court's judgment as long as the appellant's brief "reasonably appears to sustain such action." Whether to accept the appellant's statement of facts and issues as correct under these circumstances is within this Court's sound discretion. *State v. Ramey*, 2024-Ohio-5635, ¶ 9, fn. 2 (12th Dist.). We accept Appellant's statement of facts and issues as alleged in Appellant's brief in determining this appeal.

---

[1] Despite being granted three (3) extensions of time to file its appellee's brief, the State of Ohio has not filed a brief in this matter.

{¶4} Dustin Keatley, the Victim's next-door neighbor, testified, shortly after 9 a.m. on the morning of September 27, 2023, he was outside, unloading a truck off of a trailer, when he heard yelling.  Thirty seconds later, he heard someone call his name then yell, "help." The yelling was coming from the Victim's house. Keatley recognized the voice as belonging to the Victim. Keatley immediately called 9-1-1.  Perry Township Police responded to the Victim's home.  Later that morning, after "basically everyone" had left, Keatley saw the Victim.  Trial Transcript, Vol. I, p. 183.  He observed a number of marks on the Victim and described her as scared, crying, and upset. The Victim was looking for her house and car keys.

{¶5} On cross-examination, Keatley indicated he was outside his house between 9:00 and 9:30 on the morning of September 27, 2023.  He observed the Victim's car in her driveway and recalled the driver's door was open.  Keatley acknowledged, although he testified on direct examination he did not approach the Victim until after everyone had left, he did appear on the video from one of the law enforcement officer's body camera, and also spoke with a detective. Keatley informed the detective he was the individual who placed the 9-1-1 call, and why he had done so.  Keatley indicated he initially thought the yelling was occasioned by the Victim having sex. After he heard the Victim call his name and cry, "help," Keatley called police. Keatley stated he did not observe what had transpired between the Victim and Appellant.

{¶6} Perry Township Police Officer Benjamin Barrett was dispatched to the Victim's residence on the morning of September 27, 2023, in response to a domestic disturbance. Officer Barrett initially spoke with Keatley as he was the individual who had placed the 9-1-1 call. As Officer Barrett spoke with Keatley, he heard screaming and

yelling coming from the Victim's house. He also heard "what sounded to [him] like an active physical altercation: slamming, banging, that type of thing." Trial Transcript, Vol. II, p. 407.

{¶7} Officer Barrett approached the residence, knocked, and announced his presence. Because no one answered and he could hear the altercation was still ongoing, Officer Barrett opened the door. Appellant and the Victim were standing inside the doorway. Officer Barrett instructed Appellant to exit the residence. During his investigation, Officer Barrett learned an argument had ensued between Appellant and the Victim over Appellant using the Victim's vehicle. The argument quickly spiraled out of control into a physical altercation.

{¶8} Officer Barrett described the Victim as "very upset, screaming, crying, that kind of thing and * * * sweating profusely." Tr., Vol II, p. 411. The Victim was bleeding from one of her legs, her arm, and her hand. Officer Barrett added the Victim's face and forehead "looked like they had been struck with some sort of object * * * large bruising and bumps coming out of her forehead." *Id.* The officer observed blood on the front of Appellant's white undershirt. Officer Barrett did not observe any open wounds on Appellant's person.

{¶9} On cross-examination, Officer Barrett reiterated, once he entered the residence, he immediately instructed Appellant to exit the residence and Appellant complied. The Victim advised the officer she and Appellant did not live together and were not dating. Officer Barrett did not find anything in the residence which would indicate Appellant was living there. Officer Barrett acknowledged the Victim never told him

Appellant had taken her phone, her house keys, or car keys, but the officer stated he believed she had told Detective Paciorek Appellant had taken her phone.

{¶10} The Victim testified she met Appellant through her cousin in 2007. The Victim described her relationship with Appellant as mainly a friendship, but admitted they have been sexual the entire time they have known each other. She added, "we're always on and off." Trial Transcript, Vol. 1, p. 200. Appellant had been staying at her residence "consecutively" since June, 2023. *Id.* Appellant did not have a vehicle at the time and the Victim would take him wherever he needed to go.

{¶11} On the morning of September 27, 2023, the Victim drove her two children to school, leaving her house at approximately 7:20 a.m. When she returned home, Appellant was upstairs getting ready for the day. The Victim went into the kitchen and began loading the dishwasher. Appellant came downstairs, then "playfully grabbed [her] behind [her] neck and then gripped [her] butt, and he was like, Now [sic] what was all that shit you was talking," referring to a verbal altercation the two had had the night before. *Id.* at pp. 204-205. The Victim moved away and told Appellant not to grab her. Appellant began calling her names and making derogatory comments.

{¶12} The Victim told Appellant he could not use her car, but agreed to drive him wherever he needed to be. Thereafter, Appellant grabbed the Victim's keys and left the house. The Victim followed him outside. Appellant was already in the driver's seat of the vehicle. The Victim opened the passenger door and told Appellant he could not take her car. Appellant continued his verbal attack. The Victim moved away from the vehicle after Appellant put it in reverse.

{¶13} The Victim went inside and texted Appellant, "So you just going to steal my car?" *Id.* at p. 208. Appellant phoned the Victim, yelled at her, then hung up. The Victim proceeded upstairs to take a bath. Appellant came back inside, yelling and upset. After the Victim responded to Appellant's verbal assault, he pushed her to the ground. Appellant followed the Victim throughout the house, upstairs, downstairs, and into the garage, verbally accosting her while he repeatedly grabbed her, threw her to the ground, smacked, punched, and kicked her.

{¶14} Once in the garage, the Victim yelled to Keatley, whom she had seen outside earlier, for help and to call 9-1-1. Appellant then slammed her onto the concrete floor. At one point, Appellant grabbed the Victim by the throat to choke her and carried her upstairs by the neck. Shortly thereafter, the Victim heard a knock at the door and someone say, "Police." Officer Barrett entered the house and arrested Appellant.

{¶15} The Victim testified she only "gave [police] like a glimpse of what had went down, but I wasn't really comfortable speaking because they had [sic] still had [Appellant] around * * * I didn't want to really speak in front of him." *Id.* at p. 216. The Victim explained she was not able to call the police because Appellant had her phone the entire morning.

{¶16} After the police left with Appellant, the Victim contacted her father. The Victim's father transported her to Aultman Hospital. The Victim spoke to several nurses, including a domestic advocate nurse, and had x-rays taken. X-rays revealed a bruised shoulder and a broken coccyx bone. The Victim missed three (3) months of work due to her injuries. However, the Victim indicated she began a new job in November, 2023. The Victim admitted she still loves Appellant.

{¶17} On cross-examination, the Victim denied telling police and hospital staff she and Appellant did not live together. After watching footage from body camera video showing her interaction with police on September 27, 2023, the Victim acknowledged she told police a number of times she just wanted Appellant to go home and his house was in Akron. The Victim denied placing a bandage on her finger prior to the arrival of law enforcement. After viewing a still frame photograph from the beginning of her interaction with police on the day of the incident, the Victim admitted there was a bandage on her finger. The Victim denied telling officers Appellant did not have any belongings at her residence other than a necklace which had fallen off during the altercation.

{¶18} The Victim conceded she knew sending the text to Appellant accusing him of stealing her car would upset him, but explained she did not want him to take her car. When asked if Appellant was watching t.v. in her bedroom that morning, the Victim testified she does use her phone to mirror shows onto the television in her bedroom, but Appellant did not have her phone, so he was not watching t.v. The Victim agreed she knew Appellant was seeing another women at the time of the incident.

{¶19} On re-direct, the Victim explained Appellant took her cell phone after he pulled her off the bed and she was going down the stairs. The Victim explained, after she made a comment to Appellant about putting him in jail, he slapped her and took her phone.

{¶20} Appellant testified on his own behalf. Appellant stated he has known the Victim since 2009. He described the relationship as sexual, but noted they were not dating. Appellant was living in Akron in September, 2023, and did not have any belongings at the Victim's residence.

**{¶21}** Appellant admitted he was currently on probation for a prior conviction of disrupting public services. The Victim was also the victim of that offense. Appellant explained, on the morning of September 27, 2023, he had a meeting with his probation officer. Appellant stated he intended to request a transfer of his probation to Oklahoma because the woman he was dating planned to move to that state. Appellant indicated he would be required to submit to a drug screen during this meeting.

**{¶22}** Appellant stated, prior to going to the Victim's house on September 26, 2023, he informed the Victim he had a meeting with his probation officer the following morning. The Victim promised to drive him to the meeting. Appellant recalled, on the morning of September 27, 2023, he went downstairs and took the Victim's keys off the key hook in the kitchen, intending to drive himself to his meeting. Appellant explained he took the keys because the Victim previously has allowed him to borrow her car.

**{¶23}** Appellant had driven a block away from the Victim's home when he received a call from the Victim, accusing him of stealing her car. Appellant believed the Victim was attempting to trick him and get him in trouble with his probation officer. Appellant turned around and returned to the Victim's home. The Victim came outside and began yelling at him about the woman he was dating. Appellant went inside the house and upstairs to the Victim's bedroom. Appellant picked up the Victim's phone in order to watch television. Appellant explained the phone could be used to mirror shows onto the t.v.

**{¶24}** According to Appellant, the Victim came into the bedroom and tried to have sex with him. Appellant brushed off her advances because of what had just happened with the car. Appellant testified the Victim stated if he wasn't going to mess around with her then he would go to jail. Tr. 486. In an attempt to get away from the Victim, Appellant

stood up, put the Victim's phone in his pocket, went into the bathroom and closed the door. Appellant stated the Victim charged into the bathroom and pushed into him. Appellant explained the bathroom floor was wet, causing the Victim to slip and fall as she was walking down the stairs.

{¶25} Appellant testified the Victim did not want Appellant to leave alone because she knew he was going home to Akron. Appellant then tried to leave through the garage, but the Victim followed him. The Victim grabbed him, but she slipped and fell. The Victim fell again as she was following him back into the house. Appellant denied punching or kicking the Victim, asserting he was just trying to get her off of him.

{¶26} After hearing all the evidence and deliberating, the jury found Appellant not guilty of felonious assault (Count I) and strangulation (Count III), but found him guilty of disrupting public services (Count II). At the sentencing hearing on March 13, 2024, the trial court sentenced Appellant to community control and ordered Appellant to complete programming at Stark Regional Community Corrections Center. The trial court memorialized Appellant's conviction and sentence via Judgment Entry filed March 26, 2024.

{¶27} It is from this judgment entry Appellant appeals, raising the following assignments of error:


I. THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION AGAINST APPELLANT, AND THE CONVICTION MUST BE REVERSED.

## II. THE APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND MUST BE REVERSED.

### I, II

**{¶28}** In his first and second assignments of error, Appellant challenges his conviction as against the sufficiency and weight of the evidence.

**{¶29}** The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, paragraph two of the syllabus (1997). Sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, while weight of the evidence addresses the evidence's effect of inducing belief. *Id.* at 386–387. A finding a conviction is supported by the manifest weight of the evidence, however, necessarily includes a finding the conviction is supported by sufficient evidence and will therefore be dispositive of the issues of sufficiency of the evidence. *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.).

**{¶30}** An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks,* 61 Ohio St. 3d 259, paragraph two of the syllabus (1991).

**{¶31}** On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly

lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist. 1983). See also, *State v. Thompkins*, 78 Ohio St.3d 380. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

**{¶32}** Appellant was convicted of one count of disrupting public services, in violation of R.C. 2909.04(A)(1)(C), which provides:

> (A) No person, purposely by any means or knowingly by damaging or tampering with any property, shall do any of the following:
>
> (1) Interrupt or impair television, radio, telephone, telegraph, or other mass communications service; police, fire, or other public service communications; radar, loran, radio, or other electronic aids to air or marine navigation or communications; or amateur or citizens band radio communications being used for public service or emergency communications;
>
> * *
>
> (C) Whoever violates this section is guilty of disrupting public services, a felony of the fourth degree.
>
> R.C. 2909.04.

**{¶33}** Appellant maintains his conviction was based upon insufficient evidence because the State failed to establish the necessary elements of the offense.  Appellant

asserts "there was no evidence presented at trial to suggest that he interrupted or impaired any communication service that could have been used for public services or emergency communications." Brief of Appellant at p. 15.

{¶34} In support of his assertion, Appellant points to portions of the Victim's testimony regarding her phone, which he describes as "contradictory." *Id.* Appellant contends the Victim "testified that she was not able to call the police because Appellant had her phone the entire time that morning." *Id.*, citing Tr., Vol. I, at p. 216. However, the Victim texted Appellant, after he left in her car, and accused him of stealing the vehicle. Appellant submits the Victim's failure to contact law enforcement when she had the opportunity to do so earlier suggests she never intended to call the police. Appellant further argues the Victim's own testimony reveals "she was not attempting to contact emergency services, nor did she want emergency services to respond." *Id.* at p. 17. Appellant points to the Victim's testimony at trial indicating she tried to be quiet when the police knocked on the door because she wanted them to go away and she was doing everything to not get Appellant in trouble. *Id.*, citing Tr., Vol. I, at p. 363. Appellant concludes there was insufficient evidence he purposely tampered with the Victim's phone in order to interfere or interrupt her ability to contact law enforcement because the Victim never intended to call police. We disagree.

{¶35} While the testimony supports the conclusion the Victim was in possession of her phone when Appellant left in her vehicle as she used it to text him, there had only been a verbal altercation between Appellant and the Victim at this point. The Victim testified when Appellant returned, he began yelling at her and assaulting her. Tr., Vol. I, at pp. 209-214. The Victim alleged Appellant slapped her and took her phone after the

Victim made a comment to Appellant about putting him in jail. The Victim went into the garage and yelled to her neighbor, Keatley, for help and to call 9-1-1. At this point in the altercation, the Victim wanted assistance from law enforcement, but was prevented from doing so on her own as Appellant had made access to the phone impossible. See, e.g., *State v. Walters*, 2018-Ohio-3456, ¶ 26 (5th Dist.).

{¶36} Viewing the evidence in the light most favorable to the prosecution, we find the trier of fact could have found the essential elements of the crime of disrupting public services proven beyond a reasonable doubt. Appellant "purposely by any means" prevented the Victim from calling law enforcement for assistance, thereby, substantially impairing the ability of law enforcement to respond to an emergency or to protect and preserve the Victim from harm. The State is not required to prove an actual 911 emergency call was in progress when Appellant took the Victim's telephone. See *State v. Yoakum*, 2002–Ohio–249, at *2 (5th Dist.), citing *State v. Brown,* 97 Ohio App.3d 293, 301 (8th Dist.). Accordingly, we find Appellant's conviction was based upon sufficient evidence.

{¶37} Appellant also challenges his conviction as against the manifest weight of the evidence. Within this assignment of error, Appellant reasserts the same arguments he raised in support of his claim his conviction was based upon insufficient evidence. Appellant contends the State failed to meet its burden of persuasion at trial due to the Victim's lack of credibility. Appellant posits, if the jury had found the Victim to be credible, it would have convicted him of felonious assault and strangulation. He submits he was acquitted of those charges because the Victim's testimony was not credible. He

concludes, as the Victim lacked credibility, his conviction for disrupting public services was, likewise, against the manifest weight of the evidence.

**{¶38}** Appellant questions how he could be convicted of disrupting public services when the State presented the least amount of evidence to establish the charge. Appellant suggests the jury was misled and confused due to the introduction of evidence of his prior conviction for disrupting public services in which the Victim herein was the victim in the prior conviction.

**{¶39}** At trial, the Victim testified Appellant slapped her and took her phone after she made a comment about putting him in jail. Later, once she was in the garage, the Victim called to her neighbor for help and to call 9-1-1. Appellant prevented the Victim from making a 9-1-1 call by taking her phone and placing the phone out of her reach, thus, rendering it inaccessible to her. The fact the Victim also testified she tried to be quiet when the police knocked on the door because she wanted them to leave does not negate her earlier intent to call law enforcement for help. Tr., Vol. I, at p. 363. The Victim specifically testified, "I was trying to be quiet because I wanted them to go away 'cause he always says it's my fault." *Id.* The Victim added, "I was doing everything to not get him in trouble first, but he didn't want to not be in trouble hisself." *Id.*

**{¶40}** Although we review credibility when considering the manifest weight of the evidence, we are cognizant determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. *State v. Bradley*, 2012-Ohio-2765, ¶ 14 (8th Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State*

*v. Wilson*, 2007-Ohio-2202, ¶ 24. The jury may take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Antill*, 176 Ohio St. 61, 67 (1964).

**{¶41}** Furthermore, "[a] conviction is not against the manifest weight of the evidence merely because there is conflicting evidence before the trier of fact." *State v. Haydon*, 1999 WL 1260298, *7 (9th Dist.). An appellate court will not overturn a judgment on this basis alone, and may not merely substitute its judgment for that of the factfinder. *State v. Serva*, 2007–Ohio–3060, ¶ 8 (9th Dist.).

**{¶42}** Based upon the foregoing, we cannot say the jury's resolution of the testimony was unreasonable. Although there were some potentially inconsistent statements in the Victim's testimony, her testimony supports the conclusion Appellant "purposely by any means" interrupted or impaired her telephone service by removing her phone from her possession.  We cannot say the jury lost its way in reaching its guilty verdict.

**{¶43}** Appellant's first and second assignments of error are overruled.

**{¶44}** The judgment of the Stark County Court of Common Pleas is affirmed.

By: Hoffman, J.

Baldwin, P.J. and

King, J.  concur